**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **ANGELA BAIN-SILVA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 3:08-cv-99** |
| ) | |
| **TENNESSEE DEPARTMENT OF SAFETY;** ) | **Judge Thomas A. Wiseman, Jr.** |
| **COMMISSIONER OF SAFETY DAVID MITCHELL,** ) | |
| **in his official and individual capacity;** ) | |
| **COLONEL MIKE WALKER, of the Tennessee** ) | |
| **Highway Patrol, in his official and individual** ) | |
| **capacity; MAJOR JOHN SAVAGE, of the** ) | |
| **Tennessee Highway Patrol, in his official** ) | |
| **and individual capacity; LIEUTENANT** ) | |
| **BETTY BLAIR, of the Tennessee Highway** ) | |
| **Patrol, in her official and individual capacity;** ) | |
| **LIEUTENANT TANYA HUNT, of the Tennessee** ) | |
| **Highway Patrol, in her official and individual** ) | |
| **capacity; and LIEUTENANT COLONEL** ) | |
| **TRACY TROTT, of the Tennessee Highway** ) | |
| **Patrol, in his official and individual capacity,** ) | |
| ) | |
| **Defendants.** ) | |

**MEMORANDUM OPINION**

Plaintiff Angela Bain-Silva, a former employee with the Tennessee Highway Patrol, filed this action in January 2008 against the Tennessee Department of Safety, Commissioner of Safety David Mitchell in his individual and official capacities, and various officers with the Tennessee Highway Patrol in their individual and representative capacities. Plaintiff asserts causes of action under 42 U.S.C. §§ 1983 and 1985, alleging that she was disciplined and ultimately fired in retaliation for exercising her rights under the First Amendment to the United States Constitution, and that her termination violated her rights under the Equal Protection Clause of the Fourteenth Amendment.[1] Now before the Court is the

---

[1] In her response to the Defendants' Motion for Summary Judgment, Plaintiff expressly abandons the Due Process claim asserted in the Amended Complaint. In her Response to Defendants' Statement of Undisputed Facts, Plaintiff purports to withdraw any cause of action based upon her belief that she was fired in retaliation for exercising her first amendment rights, and also purports to withdraw any cause of action based upon a belief that she was fired because she was a woman (or treated disparately because she was a woman). (Pl.'s Resp. to Stmt. of Undisp. Facts (Doc. No. 41) at ¶¶ 23, 24.) Based on Plaintiff's actual Response in opposition to the Defendants' Motion for Summary Judgment, the Court concludes that Plaintiff's purported withdrawal of these causes of action in the Response to the Statement of Undisputed Facts was unintentional.

Defendants' joint Motion for Summary Judgment (Doc. No. 23), in which they argue that they are entitled to judgment as a matter of law based upon the undisputed facts.  As explained herein, the Court finds that Plaintiff has failed to establish a causal relationship between any activity protected by the First Amendment and the adverse action taken against her, and that she has not established a *prima facie* case of sex discrimination.  Consequently, Defendants' Motion for Summary Judgment will be granted.

I.      **FACTUAL BACKGROUND**[2]

   A.      **Plaintiff's Employment with the Tennessee Highway Patrol**

Plaintiff Angela Bain-Silva was employed by the Tennessee Highway Patrol ("THP"), a division of the Tennessee Department of Safety, from 1994 through early 2007.  From 1994 to 2006, Plaintiff was transferred several times based upon her requests.  When she was transferred to the Staff Inspections Unit ("SIU") in 2002, Defendant Betty Blair was her Sergeant; Defendant John Savage was her Lieutenant; and Defendant Mike Walker was her Captain.[3]  In 2004, Plaintiff requested a transfer to a different unit due to a conflict with Defendant Blair.[4]  At that point, Plaintiff transferred to work as a road trooper in Davidson County.

On August 26, 2006, Plaintiff was promoted to sergeant with the THP and reassigned to the SIU.  Back in the SIU, Defendant Blair, now a lieutenant, was once again Plaintiff's direct supervisor, and Plaintiff was concerned about the prior conflict she had had with Blair.  Although she and Blair discussed the matter and mutually agreed to "leave everything that happened in the past in the past and move

_____

[2] The factual background set forth here is derived from (1) the undisputed facts set forth in the Defendants' Statement of Undisputed Facts (*see* Pl.'s Resp. to Stmt. of Undisp. Facts (Doc. No. 41)); (2) Plaintiff's Statement of Additional Facts (Doc. No. 42), which Defendants, at least for purposes of their Motion for Summary Judgment, do not dispute; and (3) testimony in the record, including excerpts from Plaintiff's deposition and various affidavits submitted by both parties.  The facts are either undisputed or viewed in the light most favorable to Plaintiff as the non-moving party, unless otherwise indicated.

[3] The chain of command within the THP is as follows, in ascending order:  trooper, sergeant, lieutenant, captain, lieutenant colonel, and colonel.  The Commissioner of Safety is the highest position in the chain of command.

[4] Blair had given Plaintiff an evaluation with which Plaintiff disagreed.  Although the matter was resolved in Plaintiff's favor, Plaintiff believed it would be "better" to transfer.  (1/15/2009 Deposition of A. Bain-Silva ("Pl.'s Dep.") 27:22.)  She believed that Blair was also upset with her because she had "taken the unit over" in Blair's absence while Blair was at staff and command school for six months.  (Pl.'s Dep. 31:2–3.)

forward and work as a team" (1/15/2009 Deposition of A. Bain-Silva (hereafter, "Pl.'s Dep.") 29:17–22), Plaintiff felt that Blair's treatment of her after she returned to the SIU was "apprehensive" and that Blair was "stand-offish" with her. (Pl.'s Dep. 32:5, 32:17.)

Also in Plaintiff's chain of command after she returned to the SIU were Defendant John Savage, now her Captain, and Defendant Mike Walker as Colonel. There were no other commissioned officers within the SIU from 2006 until the time Plaintiff was terminated in the spring of 2007.

Whenever a Trooper is promoted to a new rank, it is probationary and becomes official only after successful completion of the probationary period. Plaintiff was terminated before completing her probationary period after her promotion to the rank of sergeant.

**B.      The Alleged Tampering with Protocols and Plaintiff's Statement to the Media**

In early October 2006, shortly after her promotion to the rank of sergeant and transfer to the SIU, Plaintiff's husband, also a THP employee, discussed with her his participation on a team involved in interviewing Trooper candidates. According to Plaintiff's husband, some of the interview "protocols" (the booklets documenting the results of interviews of potential Trooper candidates) were tampered with. Specifically, Plaintiff's husband relayed to her that Lt. Col. Danny Wilson had ordered him to change the interview booklets each interviewer completes for each candidate. At a working lunch Plaintiff attended on October 10, 2006 with Defendants Blair and Savage, Plaintiff was asked whether her husband had spoken with her about the October 5, 2006 protocols. Plaintiff reported to Savage and Blair most of what her husband had told her. Savage and Blair also asked her whether she had had any discussions with THP Lieutenant Robert Eckerman about the protocols. Plaintiff stated she had not, but did disclose that she had informed Eckerman that a certain individual had not been promoted.

Plaintiff has been friends with Robert Eckerman basically since she began working at THP in 1994. (Pl.'s Dep. 60.) Eckerman has filed at least two lawsuits against the Department of Safety as well as "multiple grievances," and is viewed generally by the Department as a nuisance or troublemaker. (Pl.'s Dep. 170:17–25.)

The Internal Affairs ("IA") division of the Tennessee Department of Safety conducted an investigation into the alleged tampering with protocols. Both Plaintiff and her husband were interviewed in connection with that investigation; Plaintiff's interview occurred on October 12, 2006 and Plaintiff gave

a statement to IA on that date. Plaintiff had a conversation with Eckerman prior to being interviewed. During the course of her interview with IA, Plaintiff was questioned extensively about Eckerman, his knowledge of the protocols, and her relationship with him. Other individuals were also interviewed by IA in connection with the protocols investigation, including Eckerman and Blair.

The TDOS ultimately concluded as a result of its investigation that there had been no tampering with the protocols and that Wilson had no involvement in wrongdoing. However, on December 6, 2006, Plaintiff's husband and three other THP employees all received recommendations for disciplinary action from the TDOS. After TDOS announced that decision, it released the IA investigative file concerning the trooper protocols to the media, including the *Tennessean.* The investigative filed included Plaintiff's statement to the IA.

On December 9, 2006, approximately two months after Plaintiff was interviewed during the TDOS investigation, she received a call at her home from Brad Schrade, a reporter with the *Tennessean.* Schrade read to Plaintiff the statement she had given the IA during her interview, and Plaintiff simply confirmed that she stood by the truth of her statement. The statement included her belief, based on her husband's version of events, that the interview protocols had been tampered with and that Wilson had ordered the interview booklets to be changed. Plaintiff immediately informed Defendant Blair that a *Tennessean* reporter had called her at home, and Blair sated she would advise Captain Savage of that fact. The *Tennessean* printed an article reporting Plaintiff's statement on December 10, 2006.

### C. The Alleged Retaliatory Actions

On December 12, 2006, Plaintiff was injured in an automobile accident and took two weeks off work. On December 29, 2006, as discussed in greater detail below, she conducted "Level I" truck inspections at the Robertson County Scale Complex. On January 3, 2007, Plaintiff, along with Blair, went to Captain Savage's office at his request. According to Plaintiff's deposition testimony, Savage began the conversation by stating he had called her in to talk with her about speaking with the media. Specifically, he informed her she was not to speak with the media for any reason. (Pl.'s Dep. 73:25–74:5.) Plaintiff asked Savage how she should have responded to the reporter given that he was simply asking her about her own statement that TDOS had released publicly, at which point Savage became "very angry, pounded the desk with his fist, [and his] face turned beet red." (Pl.'s Dep. 74: 11–12.) He again

admonished Plaintiff that she should not speak to any reporter who called her house and that she should notify her chain of command immediately upon being contacted by the media. Plaintiff responded, "[W]ell, that being said, sir, if Lieutenant Blair tells the truth, she will acknowledge that I called her the moment I hung up with the [*Tennessean*]." (Pl.'s Dep. 74:18–21.) Blair said nothing, either to deny or confirm the truth of that statement. (Pl.'s Dep. 74:18–23.)[5] Plaintiff clarified at the time of that meeting that she was not being disciplined as a result of speaking with the reporter; she received neither a written nor oral warning. (Pl.'s Dep. 75:9–13.)

Plaintiff believes, however, that she was ultimately terminated at least in part for speaking with the media. (Pl.'s Dep. 75:20–21.) In her amended complaint, Plaintiff alleged that after this meeting with Savage and throughout the month of January she began to receive the "cold shoulder" from her chain of command, that she was "taken off certain details, including training, and did not receive responses to legitimate inquiries concerning her official duties." (Am. Compl. (Doc. No. 45) ¶ 21; *see also* 4/6/2009 Affidavit of Angela Silva (Doc. No. 40) (hereafter, "Pl.'s Aff.") ¶ 13 (making the identical allegation).) In her deposition, when asked to elaborate, she explained, "Basically my presence wasn't even being acknowledged anymore." (Pl.'s Dep. 78:20–24.)

Plaintiff also believes that one of the reasons she was fired was because of her relationship with Lieutenant Eckerman. (Pl.'s Dep. 98:10–12.) This belief is based on her perception that during the investigation pertaining to the alleged tampering with protocols, she "was being questioned more about [her] relationship with Lieutenant Eckerman than . . . the issues of the protocols[.]" (Pl.'s Dep. 92:12–17.) In addition, Defendant Blair told her at some point that it would "probably be in [her] best interest" to stop communicating with Eckerman, and one of the IA investigators who interviewed her in October 2006 "made comments about him off the record after interviewing [Plaintiff] on the protocol incident." (Pl.'s Dep. 93:3–6.) Other people, including Savage, allegedly made comments about her friendship with Eckerman.

### D. The Level I Inspections

---

[5] In her affidavit filed in support of her opposition to the defendants' motion, Plaintiff now asserts that Blair denied that Plaintiff had told her about being called by the Tennessean reporter. (Pl.'s Aff. ¶ 12.)

The Tennessee Department of Safety is charged with inspecting tractor trailers to ensure that they comply with various safety rules and regulations. Employees with the THP actually conduct the inspections. A Level III Inspection is basically a "driver inspection" of a tractor trailer. (Pl.'s Dep. 103:6–7.) This involves checking the driver's log book, driver's license, medical card, "things like that." (Pl.'s Dep. 104:14–18.) Plaintiff was required to be certified to perform Level III Inspections as part of her job description. A Level I Inspection involves making the same inspection required for a Level III, but is much more involved. (Pl.'s Dep. 103:8–9; 105:4–11.) According to the Affidavit of Tanya Hunt, a Lieutenant in the Commercial Vehicle Administrative Unit who was in charge of the New Entrant Safety Audit program within that Unit in January and February 2007, a Level I inspection requires the inspector actually to enter the vehicle and inspect all the vehicle components of both the tractor and trailer, if attached. (2/2/2009 Affidavit of Tonya Hunt (Doc. No. 27) (hereafter, "Hunt Aff.") ¶ 7.)

According to Hunt, before becoming certified as a Level I inspector, a participant must first become certified to perform Level III inspections by taking the North American Standard (driver) class, referred to as the "Part A" course. Plaintiff completed the Part A course and obtained her certification to perform Level III Inspections. In 2005 Plaintiff voluntarily chose to attend the Part B course, which covers vehicle inspections, in order to become a certified to perform Level I vehicle inspections. (Hunt Aff. ¶¶ 3–4.) Plaintiff described the course as a week-long class at the end of which she passed a written test, on which she scored a 97.8. (Pl.'s Dep. 109–10.) During the course of the training, she was instructed on how to go through a Level I inspection and "reviewed a lot of the Level Three stuff as well." (Pl.'s Dep. 110:16–19.) According to Hunt, part of the initial certification requires completion of thirty-two Level I inspections along with a certified Trooper. (Hunt Aff. ¶ 4.) Plaintiff apparently completed those inspections in 2005 in order to earn her certification, although Plaintiff maintains she merely watched while someone else performed the inspections. Regardless, in order to maintain certification as a Level I inspector, Plaintiff was required to conduct 32 Level I Inspections each year thereafter. Plaintiff was not required to maintain Level I certification as part of her job classification; doing so was entirely voluntary. However, in order to maintain her voluntary Level I certification, she was required to conduct thirty-two Level I inspections in 2006.

Plaintiff therefore obtained permission from Major Savage and Lieutenant Blair to work on

Saturday, December 30 and Sunday, December 31, 2006 for the purpose of completing the Level I Inspections necessary to retain her certification. (2/29/2009 Affidavit of B. Blair (Doc. No. 26) ("Blair Aff.") ¶ 3; 2/2/2009 Affidavit of J. Savage (Doc. No. 29) ("Savage Aff.") ¶ 4.) On December 29, 2006, Plaintiff went to the Robertson County scales to conduct Level I truck inspections. Because she had never performed Level I inspections for certification by herself, Plaintiff requested assistance from Trooper Ceaser Maldonado,[6] who regularly performed such inspections. According to Plaintiff, Maldonado performed most of the work and filled out the forms, and submitted them for Plaintiff's signature. Plaintiff signed most of them but she allegedly learned later that Maldonado had signed her name to some of them. Plaintiff asserts that based on Maldonado's experience and her own lack of expertise, she believed at the time that the Level I Inspections were done correctly. (Pl.'s Aff. ¶ 24.) She denies intentionally misrepresenting any information of falsifying documents concerning the inspections. (Pl.'s Aff. ¶ 25.) During the course of one day, December 29, 2006, she and Maldonado together purportedly completed thirty Level I Inspections.

On Tuesday, January 2, 2007, Blair spoke with Plaintiff about her inspections and, according to Blair, Plaintiff informed her she had not actually worked on the Sunday. Blair therefore assumed the inspections had been performed on Friday and Saturday, December 29 and 30, 2006. (Blair Aff. ¶ 4.) Even then, Blair thought that thirty inspections were a lot to complete in just two days. (Blair Aff. ¶ 5.) Blair discussed her concerns with Savage, who asked Blair if she had reviewed and signed the inspection reports. (Savage Aff. ¶ 5.) Blair indicated that the inspection reports were completed on the computer system at the scales site and were therefore submitted electronically to the central office. Savage asked her to review the reports. (Savage Aff. ¶ 5.) Blair asked Defendant Tanya Hunt to conduct that review.

As indicated above, Hunt is a Lieutenant in the Commercial Vehicle Administrative Unit who was in charge of the New Entrant Safety Audit program within that Unit in January and February 2007. She has also been a trainer for the Part A and Part B classes, having attended Instructor training for these

---

[6] There are at least four alternative spellings of this individual's name in the record: Maldanado (used in Plaintiff's Affidavit), Maldanaldo and Maldinaldo (both used in Plaintiff's brief in opposition to Defendants' motion), and Maldonado (used in Defendants' filings). The Court has no idea which is correct and has chosen to use the version used by Defendants since their usage has been consistent and they presumably have access to documents that would verify the spelling.

classes in 1996 and 1997. (Hunt Aff. ¶ 3.) At Blair's request, Hunt first pulled the inspection reports completed by Plaintiff. On January 16, 2007, Hunt forwarded to Blair a report showing that Plaintiff had completed thirty Level I Inspections on December 29, 2009, meaning she had completed an inspection every 5.27 minutes during the course of that day. After receiving that report, Blair met with Hunt, Major Savage, and Capt. Steve Binkley on January 18, 2007 to discuss Plaintiff's inspection reports. At that time Hunt informed the other attendees that she had contacted one of the truck drivers whose truck had been inspected by Plaintiff on December 29, who informed her that a Level I Inspection had not been performed. (Blair Aff. ¶¶ 7–9.) At that meeting, Savage requested that Hunt attempt to contact other drivers who had had Level I Inspections on December 29, 2006. (Savage Aff. ¶ 7.)

Hunt did so and, on January 29, 2007, forwarded to Savage documentation detailing her contact with twenty-four of the thirty drivers or companies whose trucks Plaintiff purportedly inspected on December 29, 2006. According to Savage, the documentation submitted by Hunt indicates that one of the drivers she contacted reported a Level I Inspection was completed. The other twenty-three indicated their vehicle was not inspected. (Savage Aff. ¶ 8.)[7]

Regarding these contacts and her investigation, Hunt further attests in her affidavit as follows:

7. Of the 30 inspections Plaintiff conducted in one day, there are discrepancies in the majority of them between what the carriers/drivers reported and what is noted on the inspection reports. Plaintiff is a Level I certified inspector, which means she must conduct 32 level I inspections each year to maintain her certification. It appears these inspections were written as Level I Inspections and conducted as Level III, driver only. With the exception of one driver that I contacted, the statements from the drivers discredit Plaintiff's assertion that she conducted Level I Inspections. She has entered brake measurements in for some inspections, and as stated by the drivers, never went into the vehicles. The time frame of the inspections is also a major concern. A Level I Inspection requires entrance into the vehicle and inspecting all of the vehicle components of both the tractor and trailer, if attached. Those components include, but are not limited to: tires, lights, brakes, suspension, load securement, etc.

8. I[t] also appeared that some inspections were completed by Trooper Maldonado and either signed by her or by him under her name.

9. I examined Plaintiff's other inspections for 2006, and discovered that she conducted one Level I in August which took more than an hour and one-half (1 1/2) to complete. Other Level III inspections averaged eighteen (18) minutes.

_____

[7] Savage's affidavit makes referenced to documentation purportedly attached to the affidavit documenting contact with these twenty-four drivers. This documentation was not filed with the copy of the affidavit filed with the Court.

. . . .

11.     I have been a certified level I inspector since 1988, during these 20 years I have probably completed between 7000-8000 Level I inspections.  Presently, it still takes me approximately 30-45 minutes to complete an inspection. . . .

(Hunt Aff. ¶¶ 7–11.)

As a result of Hunt's investigation into Plaintiff's Level I Inspection reports, Defendant Blair filed an interdepartmental complaint against Plaintiff on or around January 29, 2007, which required an investigation by the Criminal Investigation Division of the THP.   On February 1, 2007, Blair instructed Plaintiff that she needed to go to Captain Dittforth's office to be interviewed by an agent from the Criminal Investigation Division.   Agent Billy Grooms from that Division informed Plaintiff that there had been an interdepartmental complaint filed against her in reference to the Level I Inspections she had conducted on December 29, 2006.   At the same time, Plaintiff was given, and signed, a Memorandum from Captain John Savage officially notifying her of the interdepartmental complaint.   Later the same day, Plaintiff received notice that she was being placed on administrative leave with pay as a result of that complaint, pending further investigation.   (Pl.'s Dep. 87–88 and Exs. 9, 10.)   Agent Grooms conducted the CID's investigation (#1-3003-SA-07).   Plaintiff provided a statement to him as part of the investigation.

On February 26, 2007, once the investigation was completed, Colonel Walker asked Defendant Tracy Trott to review the Criminal Investigation Division case file and to make a recommendation as to whether disciplinary action was warranted.   (2/2/2009 Affidavit of T. Trott (Doc. No. 30) ("Trott Aff.") ¶ 2.) Trott is a Lieutenant Colonel with the Tennessee Highway Patrol, assigned to a different unit from that in which Plaintiff worked prior to her termination.   (Trott Aff. ¶ 4.)   Prior to conducting his review, Trott had never supervised Plaintiff or had any connection to her; he was unaware that she had spoken with a reporter and had no knowledge of her friendship with Robert Eckerman.   (Trott Aff. ¶¶ 3, 19, 20.) According to Trott, he was selected to review the file because he was second in command in the department but independent from the division in which Plaintiff had worked.   (Trott Aff. ¶ 4.)

Trott determined, based upon the information in the file, including Plaintiff's statement, "that Plaintiff was attempting to complete the required number of Level I Inspections for recertification at the end of the year and falsified official documents by performing Level III Inspections, at best, and recording them as Level I Inspections."   (Trott Aff. ¶ 13.)   Based upon that determination, and his conclusion that

Plaintiff's actions constituted violations of criminal law and several departmental General Orders, Trott recommended that Plaintiff be terminated from employment as a Tennessee State Trooper. (Trott Aff. ¶¶ 14–18.) According to Trott, his recommendation was "based solely on the information within the IA investigation file" and he "was not influenced by any other person or factor." (Trott Aff. ¶ 21.)

At the same time, Trott recommended that Trooper Maldonado receive a lesser disciplinary action because Plaintiff was the individual who actually signed the inspection reports and submitted them as official documents, and because Plaintiff was the ranking officer between the two. (Trott Aff. ¶ 22.) Maldonado was initially recommended for a three-day suspension but was given five days' suspension instead, based on the fact that he had had other disciplinary problems over the course of the preceding ten years. (Pl. Dep. 138:3–9.)

Defendant Walker received Trott's recommendation and, as a result thereof, recommended to Commissioner Mitchell on March 8, 2007 that Plaintiff be terminated. Defendant Mitchell, the only person with the actual authority to terminate Plaintiff's employment with THP, relied solely on Walker's recommendation in his decision to fire Plaintiff. (2/2/2009 Affidavit of D. Mitchell (Doc. No. 28) ("Mitchell Aff.") ¶ 5.)

In her Affidavit submitted in support of her opposition to the Defendants' motion, Plaintiff attests, basically, that she did not intentionally falsify the Level I Inspection reports and that she relied on Trooper Maldonado's greater experience in conducting the inspections. She also points out that she "had nothing to gain by remaining Level I certified as only Level III certification is required." (Pl.'s Aff. ¶ 26.) Although Defendants have presented to a substantial amount of evidence from which a jury could infer that Plaintiff knew exactly what a Level I Inspection was supposed to entail, the Court accepts for purposes of the Defendants' motion that Plaintiff did not intentionally misrepresent any information or intentionally falsify documents. The probative fact, however, is that Defendants were clearly reasonable in concluding, based upon the available information, that Plaintiff had intentionally falsified the inspection reports. Plaintiff has never contested the accuracy of the information contained in the CID investigation file. In her deposition, Plaintiff admitted she now understands that the Level I Inspections that she signed off on or "okayed" were not conducted properly. (Pl.'s Dep. 132:17–22.) She also has acknowledged that she was a sergeant while Maldonado, whom she purportedly trusted to perform the inspections correctly, was a

Trooper, lower in rank than she. She has admitted that, while she was not required to have Level I certification to maintain her job or rank, she was certified and wanted to maintain her Level I certification. In light of that desire, she acknowledged that it was part of her job duties to conduct the Level I Inspections properly. (Pl.'s Dep. 132:2–14.) She also has conceded that the reports were "improperly done" (Pl.'s Dep. 142:1–2) and that they included false information. Although she was not aware at the time she signed off on the reports that they contained false information, she has agreed she should have reviewed the reports before signing off on them. (Pl.'s Dep. 142:3–24.)

Plaintiff also conceded in her deposition that the fact of the falsified reports gave Blair sufficient basis for filing a complaint against her. Plaintiff maintains, however, that Blair's true motive was to get her out of the way before her probationary period ended because Plaintiff somehow threatened Blair's authority:

> [S]he knew I was two weeks before coming off probation and making hard rank, two weeks.
>
> And she had not documented me one time for not doing my jobs. No oral warnings, no written warnings. She'd given me a job plan. I had performed everything exactly up to expectations and she knew she had to get me out of there because I had begun to question her ability to do things in the unit properly.
>
> Q.    Well, even if that's true, if she was looking for a reason – I mean, if there are falsified documents, I mean, isn't that a good reason to file a complaint?
>
> A.    Yes. But if it was for the point of having the Department's best interest, that's different than I'm going to get her fired[.]

(Pl.'s Dep. 160:1–17.) In other words, Plaintiff believed that Blair filed the complaint against her simply because she did not like her. (Pl.'s Dep. 161:2–7.)

Plaintiff's employment was actually terminated on March 8, 2007. She initiated this action on January 31, 2008.

## II.    STANDARD OF REVIEW

In reviewing a motion for summary judgment, this Court will only consider the narrow question of whether there are "genuine issues as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A motion for summary judgment requires that the Court view the " 'inferences to be drawn from the underlying facts . . . in the light most favorable to the party opposing the motion.' " *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)

(quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).  The opponent, however, has the burden of showing that a "rational trier of fact [could] find for the non-moving party [or] that there is a 'genuine issue for trial.' "  *Matsushita*, 475 U.S. at 587.  "The mere existence of a scintilla of evidence in support of plaintiff's position[, however,] will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986).  If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted.  *Anderson*, 477 U.S. at 249–52.  "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate."  *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247–49).

III.    **ANALYSIS AND DISCUSSION**

   A.    **Retaliation for Exercise of First Amendment Rights**

       42 U.S.C. § 1983 provides a remedy for constitutional violations committed by state actors.  In the case present case, the alleged constitutional violation is in the form of a claim that government officials retaliated against Plaintiff for exercising her First Amendment rights to free speech and freedom of association.  "The law is well settled in this Circuit that retaliation under color of law for the exercise of First Amendment rights is unconstitutional[.]"  *Zilich v. Longo*, 34 F.3d 359, 365 (6th Cir.1994), *cert. denied*, 514 U.S. 1036 (1995).  Likewise, it is clear that "government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right."  *Thaddeus-X v. Blatter*, 175 F.3d 378, 386 (6th Cir. 1999) (citing, among others, *Crawford-El v. Britton*, 523 U.S. 574 (misdirection of personal belongings may support a claim of retaliation for exercise of First Amendment rights); *Board of County Comm'rs, Wabaunsee County v. Umbehr*, 518 U.S. 668 (1996) (nonrenewal of plaintiff's government contract in retaliation for his exercise of free speech is actionable)).

       The Sixth Circuit has recognized that proof of a First Amendment retaliation claim "essentially entails three elements:  (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two-that is, the adverse action

was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X*, 175 F.3d at 394 (citations omitted). As the court also recognized, this formula, while generally applicable, "will yield variations in different contexts." *Id.*

For purposes of their motion, Defendants concede that Plaintiff's friendship with Robert Eckerman, a current THP officer, constitutes protected activity. With respect to Plaintiff's claim to have engaged in protected speech, however, Defendants argue first that the speech at issue was not protected because Plaintiff was not speaking as a citizen addressing issues of public concern. In addition, with respect to both Plaintiff's freedom of association and speech claims, Defendants contend that only one of the named Defendants took an adverse action against Plaintiff, and that there is no evidence of a causal connection between the protected activity and the adverse action.

### (i) *Whether Plaintiff Engaged in Protected Speech*

When the alleged "protected conduct" is speech by a government employee, yet another multi-step test applies for determining whether the speech at issue is actually protected. *See Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169, 180 (6th Cir. 2008) (citing *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003). As an initial matter, courts must determine whether the speech "addressed a matter of public concern." *Connick v. Myers*, 461 U.S. 138, 143 (1983)). In conducting that inquiry, the courts must assess "the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48. However, according to the Supreme Court's recent decision in *Garcetti v. Ceballos*, 547 U.S. 410, (2006), the courts also must determine whether the employee's speech was made "pursuant to his or her official responsibilities" or whether, instead, the "statements or complaints . . . [were] made outside the duties of employment." *Id.* at 424. In *Garcetti*, the Supreme Court held that "the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities." *Id.* Because there was no dispute in that case that the expression at issue—a written memorandum—was undertaken by the plaintiff "pursuant to his employment duties," the Court concluded that the speech was not protected and that the plaintiff's retaliation claim therefore necessarily failed. *Id.*

In the present case, Defendants allege that Plaintiff cannot establish that she was speaking as a "citizen" and that, consequently, her speech was not protected. Certainly, as Defendant argues, Plaintiff

would not have been contacted by a newspaper but for her job with THP, and she was contacted precisely because she was an individual with knowledge about an internal investigation conducted by the THP. Defendants' argument, however, is somewhat beside the point. According to *Garcetti*, the threshold inquiry is whether the speech at issue was made pursuant to the government employee's official job duties. *See Garcetti*, 547 U.S. at 419 ("[W]hen public employees make statements *pursuant to their official duties*, the employees are not speaking as citizens for First Amendment purposes." (emphasis added)). There is no suggestion here that speaking to reporters was included in Plaintiff's job description. To the contrary, it is clear that Plaintiff did not speak to the *Tennessean* reporter in the course of or pursuant to her job duties and, after the fact, was expressly advised that she should not speak with reporters. For that reason, her situation appears distinguishable from that of the plaintiff in *Garcetti*. Defendants have not established, for purposes of their motion, that Plaintiff was not speaking as a citizen.

### (ii)    The Alleged Adverse Actions

In her amended complaint, Plaintiff alleges that the retaliation to which she was allegedly subjected included being "berated" by Captain Savage on January 3, 2007 for speaking to the media, after which she received the "cold shoulder from her chain of command," was "taken off certain details, including training, and did not receive responses to legitimate inquiries concerning her official duties." (Am. Compl. ¶¶ 20–21.) No other details regarding these alleged actions is in the record. The bare allegations reiterated above are wholly insufficient to state a claim for First Amendment violation. First, it is doubtful whether conduct of the type described by Plaintiff would deter a person of ordinary firmness from continuing to engage in that conduct. *Thaddeus-X*, 175 F.3d at 394. Even if it were, Plaintiff has not offered sufficient information regarding the allegedly retaliatory behavior to support her claim.

The only other action of which Plaintiff complains is her termination which, of course, was preceded by the filing of an interdepartmental complaint by Defendant Blair and the ensuing investigations by Defendants Hunt and Trott. There is no doubt that the termination of her employment constituted an adverse action for purposes of her retaliation claim. It is not clear whether the filing of the interdepartmental complaint and the resulting investigation so qualify: If they had not resulted in termination, it is difficult to see how Plaintiff would have been substantially harmed by either action. With

her § 1985 claim, however, Plaintiff seems to be alleging that Defendants engaged in a conspiracy to retaliate against her, and that, beginning with the filing of the interdepartmental complaint, they acted in concert to do so.  Although there is no evidence whatsoever in the record that there was a concerted action, the Court accepts, for purposes of Defendants' motion, that the filing of the interdepartmental complaint and the investigation qualify as adverse actions.  The next question, of course, is whether Plaintiff has demonstrated a causal connection between the adverse actions and her engagement in protected activity.

### (iii)    *Whether Plaintiff Can Show a Causal Connection*

As Defendants point out, only two of the individual defendants, Blair and Savage, even knew Plaintiff had spoken with the media and that she was friends with Eckerman.  (Blair Aff. ¶ 10; Savage Aff. ¶ 15.)  Defendant Hunt was aware that Plaintiff knew Eckerman, but did not know they were friends, nor did she know Plaintiff had spoken to the media.  In addition, she simply complied with a request to perform an investigation into the Plaintiff's Level I Inspection reports and to convey her findings to Plaintiff's supervisors.  Plaintiff does not allege that Hunt has misrepresented any of the facts she presented in her report.  Moreover, Hunt, like Savage and Blair, had no input into the decision to terminate Plaintiff.  (Hunt Aff. ¶¶ 12–14.)  While Mitchell relied solely on Colonel Walker's recommendation, Walker had delegated the responsibility for making the recommendation to Tracy Trott, who had never supervised Plaintiff or been involved in any previous job actions initiated by her, and was unaware of Plaintiff's statements to the media and her friendship with Eckerman.  (Trott Aff. ¶¶19–20.)  Mitchell, likewise, had no knowledge of Plaintiff's statement to the media or her friendship with Eckerman.  (Mitchell Aff. ¶ 5.)  Plaintiff speculates that Mitchell's decision was somehow influenced by his friendship with Savage, but her speculation is only speculation, not evidence, and Mitchell has attested that he made the decision based solely on Walker's recommendation which, in turn, was based on Trott's investigation and recommendation.  (Mitchell Aff. ¶ 5.)

Even though Savage and Blair knew that Plaintiff had engaged in protected behavior at the time they initiated the investigation into Plaintiff's Level I Inspection reports, there is nothing in the record that suggests that the decision to do so was prompted thereby.  First, it appears that both Blair and Savage had known of Plaintiff's friendship with Eckerman long before instituting the investigation into the Level I

Inspection reports, so there is not even a temporal connection between the two. Again, nothing but Plaintiff's speculation connects her friendship with Eckerman and the adverse employment action, and speculation does not amount to evidence.[8]

Although there is a coincidence of timing between the meeting on January 3, 2007 at which Savage allegedly "berated" Plaintiff for speaking to the media, and the institution of an investigation into the Level I Inspections, Blair, according to Plaintiff, had known since early December that Plaintiff had spoken to the *Tennessean* reporter. Further, Plaintiff herself seems to believe that Blair was motivated to file the interdepartmental complaint by a personal bias and dislike of Plaintiff. Even assuming that belief to be true, the law generally does not protect at-will employees from employers or superiors who simply dislike them or do not get along with them. Moreover, Plaintiff has acknowledged that the information in Blair's possession clearly justified the filing of a report, and the record likewise indicates that the information in Blair's, and Savage's, possession justified the investigation to begin with. In addition, the only "adverse" action in which Savage is alleged to have engaged, other than yelling at Plaintiff about speaking with the media, is to authorize Blair to look more closely at Plaintiff's inspection reports. From that point on, the matter was out of his hands. Regardless, the temporal proximity between Savage's learning about Plaintiff's statements to the media and his suggesting to Blair that she look more closely at Plaintiff's inspection reports is not, standing alone, sufficient to give rise to an inference of a causal connection between the two.

As for Commissioner Mitchell's decision to terminate Plaintiff for falsifying thirty Level I Inspection reports (which was based upon Walker's recommendation, which was based in turn upon Trott's independent review of the investigation file), Plaintiff asserts only that she did not intentionally falsify the reports. She has not contested the fact that they were falsified, under her watch, and that Defendants had reasonable cause to attribute the falsification to her. Moreover, she does not dispute the independence of Defendant Trott's judgment nor his averment that he recommended her termination based on the fact that her actions constituted violations of criminal law and several departmental General Orders.

---

[8] Plaintiff appears to confuse the concepts of speculation and inference. She has not presented any evidence from which a jury could legitimately infer a causal connection.

The only circumstantial evidence Plaintiff has offered in an attempt to show causation is the fact that Maldonado was suspended for five days instead of being fired. She argues that this disparate treatment for the same behavior gives rise to an inference that the reason given for her termination was pretextual. Plaintiff, however, has not shown that she and Maldonado were actually similarly situated for purposes of that comparison. As Defendants point out, Maldonado was of lower rank than Plaintiff and it was Plaintiff, not Maldonado, who was responsible for, signed off on and submitted the falsified reports and Plaintiff who needed to get credit for conducting the inspections in order to maintain her certification as a Level I inspector.

In sum, there is simply insufficient evidence in the record from which a reasonable fact-finder could conclude that the investigation into the inspections and the subsequent termination of Plaintiff's employment in March 2007 were causally related in any way to Plaintiff's having spoken with a reporter in December or to her friendship with Eckerman. Plaintiff's § 1983 claim based on violation in retaliation for exercise of her First Amendment rights therefore fails. Because there was no constitutional violation, Defendants likewise cannot be liable under § 1985 for conspiring to violate Plaintiff's constitutional rights.

### B. Alleged Violation of Plaintiff's Equal Protection Rights

The Sixth Circuit recognizes that 42 U.S.C. § 1983 provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law, which encompasses a claim for relief under § 1983 in connection with a sex-based claim of discrimination in the public employment context. *Smith v. City of Salem*, 378 F.3d 566, 576 (6th Cir. 2004). Individuals have a right, protected by the Equal Protection clause of the Fourteenth Amendment, to be free from discrimination on the basis of sex in public employment. *Davis v. Passman*, 442 U.S. 228, 234–35 (1979). To make out such a claim, a plaintiff must prove that she suffered purposeful or intentional discrimination on the basis of gender. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–65 (1977). As the Sixth Circuit has observed on several occasions, "the showing a plaintiff must make to recover on a disparate treatment claim under Title VII mirrors that which must be made to recover on an equal protection claim under section § 1983." *Smith*, 378 F.3d at 577 (citing *Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir. 1988) (citing *Kitchen v. Chippewa Valley Schs.*, 825 F.2d 1004, 1011 (6th Cir. 1987)); *Daniels v. Bd. of Educ.*, 805 F.2d 203, 207 (6th Cir. 1986);

*Grano v. Dep't of Dev.*, 637 F.2d 1073, 1081–82 (6th Cir. 1980); *Lautermilch v. Findlay City Schs.*, 314 F.3d 271, 275 (6th Cir. 2003) ("To prove a violation of the equal protection clause under § 1983, [a plaintiff] must prove the same elements as are required to establish a disparate treatment claim under Title VII.") (quotation and citation omitted)).

Plaintiff does not claim to have direct evidence of sex discrimination; she seeks to prove her claim through indirect evidence. An indirect-evidence claim is analyzed under the familiar three-part burden-shifting analysis initially articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, a plaintiff must first establish a *prima facie* claim of discrimination by presenting evidence sufficient to establish that (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the job in question; and (4) she was replaced by or treated differently than a similarly situated person outside her protected class. *McDonnell Douglas*, 411 U.S. at 802.

Plaintiff's claim is premised on the allegation that Maldonado was suspended for five days whereas she was fired. As indicated above, however, Plaintiff has not established that she and Maldonado were actually "similarly situated" for purposes of her *prima facie* claim of discrimination. Pursuant to Sixth Circuit precedent, to show that another employee is similarly situated, a plaintiff "is required to prove that all of the relevant aspects of [her] employment situation were 'nearly identical' to those of [the comparator's] employment situation." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)). That is, to be deemed similarly situated, "the individuals with whom the plaintiff seeks to compare his/her treatment must have . . . been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992).[9]

--------

[9] The Court recognizes that *Mitchell* has been somewhat limited by subsequent Sixth Circuit case law, but its holding is still applicable insofar as it requires courts to consider those factors that are relevant to the particular context. *See Jackson v. FedEx Corporate Servs.*, 518 F.3d 388, 396 and n.4 (6th Cir. 2008) (referring to its previous recognition that courts should consider the factors enumerated in *Mitchell* but apply only those factors relevant to the factual context, and noting that the district court did not err in citing the *Mitchell* factors as "relevant considerations" (citing *McMillan v. Castro*, 405 F.3d at 413–14 (6th Cir. 2005), and *Ercegovich*, 154 F.3d at 350–52)).

Here, Plaintiff does not dispute that she was of a higher rank than Maldonado and therefore was held to a higher standard. More importantly, she cannot show that they engaged in the same behavior, since Plaintiff was the one who needed to complete the inspections in order to retain her Level I certification, and Plaintiff was the one who authorized, signed and submitted the falsified reports. Because of the difference in conduct and the degrees of responsibility, he Court finds that the Plaintiff and Maldonado were not similarly situated in all relevant respects. Consequently, the Court finds that Plaintiff has failed to state a *prima facie* claim of discrimination. Defendants are therefore entitled to summary judgment as to this claim too.

IV.     **CONCLUSION**

For the reasons set forth herein, the Court finds that Defendants are entitled to summary judgment and dismissal of the claims asserted against them. An appropriate Order will enter.


Thomas A. Wiseman, Jr.
Senior U.S. District Judge